[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 16, 2011
JOHN LEY
CLERK

_____

No. 10-11534

_____

D.C. Docket No. 1:08-cr-00369-JOF-RGV-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RONREGUS ARNOLD JORDAN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(March 16, 2011)

Before MARCUS and ANDERSON, Circuit Judges, and ALBRITTON,[*] District Judge.

MARCUS, Circuit Judge:

_____

[*] Honorable William H. Albritton, III, United States District Judge for the Middle District of Alabama, sitting by designation.

Ronregus Arnold Jordan challenges his conviction following a trial for one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). The district court sentenced Jordan to 240 months' imprisonment, followed by five years' supervised release. On appeal, Jordan argues that: (1) the district court erred in denying his motion to suppress evidence as fruit of an illegal seizure of his person; (2) the district court erred in denying his motion to dismiss for selective prosecution because he presented a prima facie case that prosecutors in the Northern District of Georgia target African Americans for prosecution under the Armed Career Criminal Act ("ACCA"); and (3) Section 18 U.S.C. § 922(g)(1) is unconstitutional, facially and as applied, because the possession of firearms by a convicted felon does not have a substantial effect on interstate commerce. After thorough review of the parties' briefs, the record, and oral argument, we affirm.

"Because rulings on motions to suppress involve mixed questions of fact and law, we review the district court's factual findings for clear error, and its application of the law to the facts de novo." United States v. Bervaldi, 226 F.3d 1256, 1262 (11th Cir. 2000). Further, "all facts are construed in the light most favorable to the prevailing party below." Id. We are not restricted to the evidence presented at the suppression hearing and instead consider the whole record.

United States v. Epps, 613 F.3d 1093, 1097 (11th Cir. 2010). Similarly, in reviewing the denial of a motion to dismiss for selective prosecution, we review the district court's factual findings for clear error and its legal conclusions de novo. United States v. Smith, 231 F.3d 800, 806 (11th Cir. 2000). We review a district court's denial of a request for discovery in a selective prosecution claim for abuse of discretion. United States v. Quinn, 123 F.3d 1415, 1425 (11th Cir. 1997). We review the constitutionality of a statute de novo. United States v. Phaknikone, 605 F.3d 1099, 1107 (11th Cir. 2010).

First, we are unpersuaded by Jordan's claim that the district court erred in denying his motion to suppress. The Fourth Amendment protects individuals from unreasonable search and seizure. U.S. Const. amend. IV. Evidence obtained in violation of the Fourth Amendment must be suppressed. United States v. Gilbert, 942 F.2d 1537, 1541 (11th Cir. 1991). Not all interactions between law enforcement and citizens, however, implicate the scrutiny of the Fourth Amendment. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may [a court] conclude that a 'seizure' has occurred." Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968). We have categorized encounters between police and citizens into three types, with varying levels of Fourth Amendment scrutiny: "(1) police-citizen exchanges

involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests." United States v. Perez, 443 F.3d 772, 777 (11th Cir. 2006).

The first type of encounter, often referred to as a consensual encounter, does not implicate the Fourth Amendment. Id. The government bears the burden of proving voluntary consent based on a totality of circumstances. United States v. Beckham, 505 F.2d 1316, 1318 (5th Cir. 1975).[1] "If a reasonable person would feel free to terminate the encounter, then he or she has not been seized." Perez, 443 F.3d at 777-78 (quotations and emphasis omitted). "There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets." United States v. Franklin, 323 F.3d 1298, 1301 (11th Cir. 2003) (quotations omitted). If the citizen's cooperation is induced by "coercive means" or if a reasonable person would not "feel free to terminate the encounter," however, then the encounter is no longer consensual, a seizure has occurred, and the citizen's Fourth Amendment rights are implicated. See United States v. Drayton, 536 U.S. 194, 201 (2002).

---

[1] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit issued before October 1, 1981.

In determining whether a police-citizen encounter was consensual or whether a seizure has occurred, we consider the following factors:

> whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police.

Perez, 443 F.3d at 778 (quotations omitted). We do not apply these factors rigidly, however, but rather use them as relevant guidance, to be considered "among other things." See id. The ultimate inquiry remains whether a person's freedom of movement was restrained by physical force or by submission to a show of authority. See California v. Hodari D., 499 U.S. 621, 626 (1991). When a suspect flees from the police, he is not submitting to their authority and therefore is not seized. Id.

With regard to the second category of police-citizen encounters -- brief seizures and investigatory detentions, Perez, 443 F.3d at 777 -- the Fourth Amendment does not prohibit a police officer, "in appropriate circumstances and in an appropriate manner [from] approach[ing] a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest," Terry, 392 U.S. at 22. That is, law enforcement officers may seize a suspect for a brief, investigatory Terry stop where (1) the officers have a

5

reasonable suspicion that the suspect was involved in, or is about to be involved in, criminal activity, and (2) the stop "was reasonably related in scope to the circumstances which justified the interference in the first place." Id. at 19-20, 30.

"While reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (quotations omitted). Again, we look to the totality of the circumstances to determine the existence of reasonable suspicion. United States v. Williams, 619 F.3d 1269, 1271 (11th Cir. 2010) (per curiam). Defensive behavior toward police is a relevant factor in this inquiry. See United States v. Reeh, 780 F.2d 1541, 1545 (11th Cir. 1986). Moreover, the presence of "a visible, suspicious bulge" on an individual may give rise to reasonable suspicion, particularly when the individual is present in a high-crime area. See United States v. Hunter, 291 F.3d 1302, 1306 (11th Cir. 2002).

In this case, we need not decide at precisely what point, if any, the officers effected a Terry stop, because numerous facts support the district court's finding that the officers formed reasonable suspicion well before that point. The critical facts include these. Officers Frederick Paige and Keith Backmon, field

6

investigators for the Atlanta Police Department, were patrolling in an area known for narcotics sales when they saw the defendant Jordan walking down the middle of the street. Both officers wore plain clothes but exhibited their badges identifying themselves as police officers. Paige pulled his unmarked car over in a way that did not block Jordan's path. Jordan walked to the sidewalk and approached the police car on the passenger side. The officers told the defendant not to walk in the middle of the street, and he immediately became belligerent. Jordan yelled at the officers that he had not done anything wrong, and asked, "Why you all fuck with me?"

Officer Paige got out of his car to investigate further. As he approached Jordan, he noticed a gun-shaped bulge in the defendant's pocket. With that the officers moved to detain Jordan, but notably, before they could touch him, Jordan took off running. Officer Backmon pursued Jordan on foot, while Paige followed him in the patrol car. Paige, along with some other patrol units, caught up with the defendant, and Paige grabbed him. Paige wrestled with Jordan, who had the firearm in his hand. The officers ultimately wrestled the gun from the defendant, who was then arrested.

First, the officers knew going into the encounter that Jordan was present in an area known for crime. Second, and more significantly, Jordan became

7

suspiciously defensive when confronted about walking in the middle of the street, belligerently yelling that he had not done anything wrong. Third, and most importantly, Officer Paige saw a gun-shaped bulge in Jordan's pocket. Once the officers became aware of these facts, they had the requisite reasonable suspicion to conduct a Terry stop concerning a potential firearms offense. See Hunter, 291 F.3d at 1306; Reeh, 780 F.2d at 1545.

The officers did not, however, detain the defendant at that point. Indeed the initial encounter with Jordan lasted some ninety seconds. It did not constitute a seizure for Fourth Amendment purposes. For one thing, Jordan approached the patrol car on his own. The police officers did not physically block or impede the defendant's path. The officers did not ask Jordan for identification, nor did they brandish their weapons at any point. They did not direct the defendant to do anything other than to get out of the middle of the street. The officers did not touch the defendant until after he fled and they chased him down. Quite simply, the officers did not make the requisite show of authority necessary to trigger a Fourth Amendment seizure until after the defendant fled. By the time the defendant was seized the officers plainly had reasonable suspicion to detain him. See Terry, 392 U.S. at 19-20, 30; Hunter, 291 F.3d at 1306; Reeh, 780 F.2d at 1545.

We likewise reject Jordan's claim that the district court erred in denying his motion to dismiss for selective prosecution. It is by now abundantly clear that under the Due Process Clause of the Fifth Amendment, "the decision whether to prosecute may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification." Smith, 231 F.3d at 807 (quotations omitted). In establishing that they are being selectively prosecuted in an unconstitutional manner, defendants bear a "demanding" burden. Id. "In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present clear evidence to the contrary." Id. (quotations omitted). Consistent with ordinary equal protection standards, we require a showing "that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose." Id. at 808 (quotations omitted). Further, in order to obtain an evidentiary hearing on a selective prosecution claim, "the defendant must present facts sufficient to create a reasonable doubt about the constitutionality of a prosecution." United States v. Silien, 825 F.2d 320, 322 (11th Cir. 1987) (per curiam) (quotations omitted). Similarly, in order to obtain discovery in support of such a claim, a defendant must provide "some evidence tending to show the existence of the essential elements of the defense." United States v. Armstrong, 517 U.S. 456, 468 (1996) (quotations omitted).

The discriminatory effect prong of this test requires that "similarly situated individuals were not prosecuted." Smith, 231 F.3d at 809. As we've explained:

> [A] "similarly situated" person for selective prosecution purposes [is] one who engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant -- so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan -- and against whom the evidence was as strong or stronger than that against the defendant.

Id. at 810. We have considered a comparison of the criminal histories of defendants to be relevant to the "similarly situated" inquiry. See Quinn, 123 F.3d at 1426. Accordingly, "raw statistics regarding overall charges say nothing about charges brought against similarly situated defendants." United States v. Bass, 536 U.S. 862, 864 (2002) (mem.) (per curiam) (emphasis omitted). The discriminatory purpose prong requires that "the decisionmaker selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Wayte v. United States, 470 U.S. 598, 610 (1985) (quotations and alteration omitted).

The district court correctly denied Jordan's motion to dismiss for selective prosecution because, at the very least, he failed to establish discriminatory effect. As the record shows, Jordan was convicted of possession of a firearm and subject

to the Armed Career Criminal Act sentencing enhancement under 18 U.S.C. §

924(e)(1), because he had been convicted of at least three prior qualifying

convictions for purposes of the ACCA.[2] In order to establish discriminatory

effect, Jordan would have to present clear evidence that a similarly situated

defendant of another race was treated differently than he. The data that Jordan

submitted in his motion to dismiss showed only that African Americans account

for approximately 93% of ACCA prosecutions in the Northern District of Georgia,

while they account for significantly less than 93% of the general population or of

the population of convicted felons who carry firearms. Jordan's data did not,

however, include the criminal histories of the other defendants. As a result, his

figures are not probative of the "similarly situated" inquiry of the discriminatory

effect test. See Bass, 536 U.S. at 864; Quinn, 123 F.3d at 1426. Indeed, Jordan

did not show that a single arrestee who was not prosecuted under the ACCA

qualified for such prosecution, much less possessed a criminal history as

substantial as his own. Therefore, he "has not presented 'some' evidence tending

to establish selective prosecution," much less facts sufficient to create a reasonable

---

[2] In fact, Jordan had been convicted of at least eight prior qualifying felony convictions for purposes of the ACCA. These include his convictions for the following eight counts: (1) one count of burglary of a dwelling in 1992; (2) four counts of burglary of a dwelling in 1999; (3) one count of burglary of a dwelling in 2006; and (4) two counts of burglary of a dwelling in 2006.

doubt about the constitutionality of his prosecution. Accordingly, Jordan was not entitled to an evidentiary hearing or discovery on the claim, and his selective prosecution claim fails.

Finally, we can discern no merit in Jordan's constitutional challenge to 18 U.S.C. § 922(g)(1). Pursuant to Section 922(g)(1), it is unlawful for a convicted felon "to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(1).

We have repeatedly held that Section 922(g)(1) is not a facially unconstitutional exercise of Congress's power under the Commerce Clause because it contains an express jurisdictional requirement. See, e.g., United States v. Scott, 263 F.3d 1270, 1273 (11th Cir. 2001) (per curiam). The jurisdictional requirement is satisfied when the firearm in question has a "minimal nexus" to interstate commerce. Id. at 1274. We have also held that Section 922(g)(1) was not unconstitutional as applied to a defendant who possessed a firearm only intrastate because the government demonstrated that the firearm in question "had travelled in interstate commerce." United States v. McAllister, 77 F.3d 387, 390 (11th Cir. 1996); see also United States v. Dupree, 258 F.3d 1258, 1260 (11th Cir.

12

2001) (holding that brandishing a firearm that was manufactured in another state suffices to establish the required "minimal nexus to interstate commerce"). We are bound by prior panel decisions unless or until we overrule them while sitting en banc, or they are overruled by the Supreme Court. United States v. Vega-Castillo, 540 F.3d 1235, 1236 (11th Cir. 2008) (per curiam).

Here, the district court did not err in convicting Jordan of violating Section 922(g)(1). Jordan's argument that Section 922(g)(1) is facially unconstitutional is foreclosed by our prior precedent. Scott, 263 F.3d at 1273. Jordan's as-applied challenge to Section 922(g)(1) is also unavailing because the government introduced sufficient evidence to prove that the firearm was manufactured and assembled outside the state of Georgia -- specifically, agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") testified that the gun found on Jordan was sold in the state of Mississippi in 1981, and that the gun was a Smith & Wesson revolver, marked with the words "Made in the USA," and "Springfield, Massachusetts." See Dupree, 258 F.3d at 1260. These precedents have not been overruled by the en banc Court or by the Supreme Court.

**AFFIRMED.**