[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

———————————————

No. 11-12274
Non-Argument Calendar

———————————————

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 29, 2011
JOHN LEY
CLERK

D.C. Docket No. 1:10-cr-00113-TWT-AJB-2

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

MARK BROTEMARKLE,

Defendant–Appellant.

———————————————

Appeal from the United States District Court
for the Northern District of Georgia

———————————————

(December 29, 2011)

Before CARNES, WILSON and KRAVITCH, Circuit Judges.

PER CURIAM:

A jury convicted Mark Brotemarkle of conspiracy to possess with intent to manufacture fewer than 1,000 marijuana plants and aiding and abetting the possession of fewer than 1,000 marijuana plants with intent to manufacture, in violation of 21 U.S.C. § 841(b)(1)(A)(vii). Prior to trial, Brotemarkle moved to suppress certain statements that he made to the police on the evening of his arrest before he was given the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 478 (1966). The district court denied his motion. Brotemarkle appeals, contending that admission of his statement violated his Fifth Amendment rights. Because any error in admitting those statements was harmless, we affirm.

I.

Brotemarkle, Jennifer McChan, Phillip Laughlin, Sara Rae Townsend, and Derek O'Neal were charged with, among other things, conspiracy to possess and possession of a large number of marijuana plants. Most of those plants were discovered at a house in Sandy Springs, Georgia, located on Habersham Waters Road (the "Habersham house").

In December 2009, police received a complaint about unusual activity at and smells emanating from the Habersham house. At Brotemarkle's trial, Detective Spears, the lead detective on the case, testified that, when he responded to the complaint, he noticed two cars parked at the house. One of the cars, a tan

2

Nissan, was registered to a Ms. Georgia McChan of Missouri. Brotemarkle's girlfriend and the mother of his one-year old son was Jennifer McChan.[1] Both Brotemarkle and McChan had Missouri driver's licenses. Detective Spears and other officers visited the address several times in late 2009 and early 2010 and, on at least one occasion, detected the strong odor of fresh marijuana from the street in front of the house, even though the temperature was below freezing.

As six officers surveilled the house on January 8, 2010, they saw three men emerge. One got into a black BMW and the other two got into the tan Nissan. The officers tailed the two vehicles. One group of officers conducted a traffic stop on the BMW. Meanwhile, Detective Spears and another detective watched as the Nissan pulled into a gas station, where Detective Spears saw that Brotemarkle was driving the car and O'Neal was his passenger.

As officers approached the BMW, Laughlin opened the driver's door and the officers were immediately confronted with the smell of marijuana. The officers found the remains of a marijuana cigarette under the driver's seat and raw marijuana leaves in the trunk. They took a cell phone from Laughlin and placed it in the center console of the police car and then, because it was bitterly cold, placed

---

[1] Although evidence elsewhere in the record establishes that Georgia McChan is Jennifer's mother, the precise relationship between the two does not appear to have been proved to the jury in Brotemarkle's trial.

Laughlin in the backseat of the car to interview him. When both officers briefly stepped outside to take calls related to the case, Laughlin reached through the divider between the front and rear of the vehicle and retrieved his cell phone. He called O'Neal and, according to a recording of the call captured on the patrol vehicle's recording equipment, instructed him to "[h]urry, run, go" to "[d]estroy everything at the house" because "they're onto us" and "[t]hey're trying to get a search warrant."

Back at the gas station, Detective Spears saw O'Neal and Brotemarkle get back into the Nissan, but he lost sight of the car as it drove away. Shortly thereafter, another officer stationed in a neighbor's backyard saw Townsend, McChan, and either O'Neal or Brotemarkle exit the backdoor of the Habersham house with Townsend and Laughlin's eight-year-old daughter and Brotemarkle and McChan's one-year-old son. One of the three adults also placed a large object into the trunk of the tan Nissan. The two women and children got into the Nissan and drove away, while the man returned to the house. Two officers saw the lights go off in the house and then saw Brotemarkle and O'Neal exit through the backdoor and begin hiding things in the backyard. When officers announced their presence, the two men began to run but were almost immediately intercepted by Detective Spears. Both men reeked of fresh (not smoked) marijuana.

4

Officers discovered that O'Neal had hidden a duffel bag containing three firearms and a backpack containing a jar of marijuana and five plastic bags of marijuana of equal weight. Brotemarkle had hidden a loaded firearm with an attached extended magazine.

Not far away, McChan pulled the Nissan into a grocery store parking lot. Officers approached and identified the two women. When officers asked whether the women had any drugs, weapons, or large sums of money, McChan pulled out a large stack of cash ultimately determined to be in excess of $21,000. Additionally, officers found a ballast generator, which officers testified is commonly used to power marijuana grow lights, in the trunk.

One officer, who had been in contact with the Division of Family and Children Services to secure a place for the two children, asked Brotemarkle whether he was the father of the infant. Brotemarkle said yes. Several minutes later, another officer asked Brotemarkle for his license, address, date of birth, and other information. During that exchange, after Brotemarkle gave a Missouri address, one of the officers asked: "How long you been staying here? How long you been here?" Brotemarkle responded, "about a month."

Inside the Habersham house, officers were greeted by five pit bulls and two Rottweilers, at least some of whom were aggressive. The smell of marijuana

permeated the house. On the second floor, officers discovered several rooms that contained items indicating that they had been occupied by several adults and an infant. At trial, the jury saw photographs of those living quarters showing a stroller, a blanket, and toys. The basement had been converted into a marijuana grow room with sophisticated lighting, ventilation, and irrigation systems, which housed 853 live marijuana plants. Throughout the house, officers found discarded trimmings from marijuana plants, marijuana residue, and paraphernalia.

On the day before his trial began, Brotemarkle moved to suppress the statements he made at the scene. He argued, and the government did not dispute, that he was not given his *Miranda* warnings before the officers questioned him. The government responded that the statements fell under the routine booking exception outlined by a plurality of the Supreme Court in *Pennsylvania v. Muniz*, 496 U.S. 582 (1990) and accepted by this court in *United States v. Sweeting*, 933 F.2d 962 (11th Cir. 1991). On the third day of the trial, the government sought to introduce a recording and transcript of those statements and, after a *Jackson-Denno*[2] hearing regarding their admissibility, the district court admitted the evidence, finding the statements were responses to routine booking questions.

II.

_____

[2] *Jackson v. Denno*, 378 U.S. 368 (1964).

6

"Because rulings on motions to suppress involve mixed questions of fact and law, we review the district court's factual findings for clear error, and its application of the law to the facts *de novo*." *U.S. v. Jordan*, 635 F.3d 1181, 1185 (11th Cir. 2011) (internal quotation marks omitted). We construe all facts in the light most favorable to the prevailing party—in this case, the government. *Id.*

The Constitution's Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. To preserve that right in the face of custodial pretrial interrogation, the Supreme Court has held that "a person must be warned that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 478 (1966). Statements that a defendant makes in response to interrogation before these warnings are given generally may not be used at his trial. *Id.* at 444.

But there are exceptions. Among those is the "well-established 'routine booking exception,'" under which a defendant's answers to questions designed to elicit the information necessary to complete booking may be used against him, even if those answers turn out to be incriminating. *United States v. Doe*, 661 F.3d 550, 567 (11th Cir. 2011) (quoting *Muniz*, 496 U.S. at 601). The routine booking

7

exception permits the use of statements made in response to questions "reasonably related to the police's administrative concerns." *Muniz*, 496 U.S. at 601-02. We have held that a suspect's pre-*Miranda* warning responses to an officer's request for his address was admissible when there was no evidence that the question was intended to elicit an incriminating response. *Sweeting*, 933 F.2d at 965.

Even if no exception applies, however, "[t]he admission of statements obtained in violation of *Miranda* is subject to harmless error scrutiny. 'The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'" *United States v. Arbolaez*, 450 F.3d 1283, 1292 (11th Cir. 2006) (quoting *Hart v. Att'y Gen. of Fla.*, 323 F.3d 884, 895 (11th Cir. 2003)). We must ask whether, "after we subtract the statements that should not have been admitted at [Brotemarkle's] trial, the remaining evidence is so overwhelming that we are convinced beyond a reasonable doubt that the improperly admitted evidence did not affect the verdict." *United States v. Street*, 472 F.3d 1298, 1315 (11th Cir. 2006). The government bears the burden to demonstrate that an error was harmless beyond a reasonable doubt. *United States v. Lee*, 427 F.3d 881, 892 (11th Cir. 2005).

### III.

The crux of Brotemarkle's argument is that admission of his statements

irrevocably prejudiced the jury against his defense that he was "merely present" and not a participant in the drug-growing operation. He notes that the statements on the recording that the district court admitted over his objection were not made at a jail while he was being booked, but at the scene while officers waited for a search warrant. We have never held that inquiry at the scene of a crime about how long a person has been there qualifies as the kind of "routine" biographical information "reasonably related to . . . administrative concerns" that would satisfy the predicates for this narrow exception to the *Miranda* requirement. Nor, Brotemarkle argues, does that query seem particularly relevant to placing his child. Thus, he says, the twice-asked question intentionally extracted his incriminating admission regarding the length of his residence at the Habersham house.

But we need not resolve on which side of the line Brotemarkle's statements fall. We are convinced that any error in their admission was harmless because the evidence of Brotemarkle's guilt was overwhelming. *See United States v. Rhind*, 289 F.3d 690, 694 (11th Cir. 2002) (concluding that error was harmless beyond a reasonable doubt where "the other evidence of guilt was so overwhelming that the defendant[] suffered no prejudice from the admitted evidence").

Officers testified that, on the night of his arrest, Brotemarkle was driving a tan Nissan registered to a family member of his girlfriend and the mother of his

9

son that had previously been observed at the house for over a month. He then returned to the Habersham house at the direction of a co-conspirator who called his passenger, O'Neal, and instructed them to "clean the house" and "destroy everything." *United States v. Ruz-Salazar*, 764 F.2d 1433, 1435 (11th Cir. 1985) (noting that actions to avoid detection of an ongoing drug operation evidence participation in it). Several officers saw Brotemarkle turning off lights in the house and then hiding a loaded firearm with an extended magazine in the backyard while O'Neal hid other firearms and marijuana packaged for sale. When officers confronted them, both attempted to flee. *See United States v. McDonald*, 935 F.2d 1212, 1219 (11th Cir. 1991) (stating that flight from police indicates more than "mere presence" at the scene). Minutes later, Brotemarkle's girlfriend was stopped driving the same tan Nissan with more than $21,000 in cash on her person and equipment peculiarly suited to growing marijuana in the trunk.

When Brotemarkle was arrested, according to officers' testimony, he smelled very strongly of fresh marijuana. The same smell emanated so heavily from the house to which he had returned after Laughlin's phone call and from which he was fleeing that it was detectable from the street. *See Ruz-Salazar*, 764 F.2d at 1435 (noting that detectable odor of marijuana may be significantly probative evidence of knowing participation). The jury saw photographs from

10

inside the house showing a child's stroller, blankets, and toys, which indicated that an infant had been living in a portion of the house along with a man and a woman, presumably Brotemarkle, McChan, and their son. Also in the house, officers found 853 marijuana plants in an extensive indoor marijuana-growing operation, as well as marijuana trimmings and other paraphernalia strewn throughout the house. *See United States v. Cruz-Valdez*, 901 F.2d 948, 962 (11th Cir. 1990) (holding that, circumstances, including "large quantit[ies] of marijuana" at the scene of his apprehension, may strongly indicate a defendant's participation).

The evidence of the circumstances under which Brotemarkle was arrested at the Habersham house and his actions leading up to that arrest wholly overwhelm any effect his statement, even if erroneously admitted, may have had on his "mere presence" defense. Weighing the probative force of this evidence, we are convinced that no jury who heard all of it, even without having heard Brotemarkle's admission about the length of his stay, could have had any doubt about his guilt. Accordingly, and after thorough review of the record, we conclude that any error in the admission of Brotemarkle's statement was harmless. Therefore, we affirm his conviction.

**AFFIRMED**.