[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-11008
Non-Argument Calendar
_____

D.C. Docket No. 2:12-cr-00188-MHT-SRW-1


UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

CHARLES DEAN PARTIN,

Defendant – Appellant.


_____

Appeal from the United States District Court
for the Middle District of Alabama
_____

(December 16, 2015)

Before HULL, WILLIAM PRYOR, and JORDAN, Circuit Judges.

PER CURIAM:

Charles Partin appeals his convictions and 292-month sentence for one count of transportation of a stolen vehicle, in violation of 18 U.S.C. § 2312, and two counts of transportation of a minor with the intent to engage in criminal sexual activity, in violation of 18 U.S.C. § 2423(a).  Mr. Partin raises four issues on appeal.  First, he argues that the district court erred by admitting his pre-*Miranda* statements made to park rangers.  Second, he asserts that the district court abused its discretion by admitting DNA evidence that showed he was the father of the child of the victim A.L.  Third, he contends that the district court incorrectly denied his motion for judgment of acquittal.  And finally, he claims that the district court erred by applying a sentencing enhancement for obstruction of justice.  After a thorough review of the record and the parties' briefs, we affirm.

## I

### A

On September 3, 2012, at around 5:00 p.m., Officer Jeremy Morrison, a park ranger in Hamilton County, Tennessee, received a report from a park employee of what he believed to be a minor female performing oral sex on an adult male in a vehicle at a remote campsite area.  Officer Morrison, along with Officer Christopher Baxter and Shannon McDonald, went out to locate the vehicle and campsite identified by the employee.

2

Upon arriving at the campsite, Officer Morrison found Mr. Partin and A.L., the victim, sitting in the vehicle described by the employee, watching a movie. Officer Morrison approached the vehicle, identified himself, explained why he had come to their campsite, and asked for their identification and A.L.'s age. Both Mr. Partin and A.L. responded that they had not been engaging in oral sex, and Mr. Partin stated, "[S]he doesn't do that. I can't get her to do that." D.E. 106 at 6. Mr. Partin gave Officer Morrison his identification. Both Mr. Partin and A.L. said that she was 18, but A.L. did not have any identification.

Officer Morrison asked A.L. to step out of the vehicle and walk up the hill with him so that he could get her information to verify her identity. While Officer Morrison took A.L. up to the patrol car where Officer McDonald was waiting, Officer Baxter stayed with Mr. Partin. At first, A.L. gave Officer Morrison a false date of birth, and he was unable to verify her identity. Eventually, however, she admitted that she was only 15 years old and that Mr. Partin was her step-father. When Officer Morrison returned to the vehicle, Mr. Partin maintained that A.L. was 18, that she was a friend of the family and his babysitter, and that they were at the park on vacation.

Officer Morrison went back to A.L. and asked her for her legal guardian. A.L. provided her mother's name but said that she did not have her phone number. She told Officer Morrison that he would have to contact another person, whose

3

number was in Mr. Partin's phone, to get in touch with her mother.  While speaking with A.L., Officer Morrison learned that she was pregnant and that she and Mr. Partin had come to the park because they were running from the Alabama Department of Human Resources.

Once Officer Morrison learned how to reach A.L.'s mother, he returned to the vehicle and told Mr. Partin that A.L.'s legal guardian would need to be contacted.  Mr. Partin asked why A.L.'s legal guardian would need to be contacted if A.L. was 18, but ultimately agreed to give Officer Morrison his phone.  After Officer Morrison retrieved the contact information, he placed the phone on the hood of Mr. Partin's car, where Mr. Partin was sitting.  Mr. Partin, up to this point, was not restrained.

Officer Morrison asked Mr. Partin for consent to search the vehicle and the two tents next to the vehicle at the campsite.  Mr. Partin signed a consent to search form.  In one tent, Officer Morrison found a laundry hamper, and in the second tent he found male and female clothing, a bed made out of blankets, and wet towels. Officer Morrison did not remove any of the items from the tent.  In Mr. Partin's vehicle, Officer Morrison found a sex toy in a flute case.  Mr. Partin claimed that it belonged to A.L. and was not his.

Shortly after Officer Morrison began the search, Mr. Partin became upset, and began to collect the items from his campsite as if he was getting ready to leave.

4

At that point, Officer Morrison was worried that Mr. Partin was moving and potentially destroying evidence, and explained to Mr. Partin that he was going to be detained. At 7:04 p.m., almost two hours after Officer Morrison arrived at the campsite, Mr. Partin was patted down and handcuffed. While Mr. Partin was detained, no investigatory actions were taken. Officer Morrison contacted the Sherriff's Office, and Detective Greg Carson, a child abuse detective, responded to the scene. At this time Detective Carson read Mr. Partin his *Miranda* rights and took off Mr. Partin's handcuffs.

Officer Morrison heard Detective Carson go over the *Miranda* rights with Mr. Partin, saw Mr. Partin sign a waiver of rights form, and heard Mr. Partin indicate that he understood his rights. At no point did Officer Morrison hear Mr. Partin request an attorney or state that he did not want to answer any questions. Mr. Partin was handcuffed again and transported to the police station.

After her return to Alabama, A.L. was taken to a medical center by an Alabama Department of Human Resources official for an ultrasound. While she was filling out paperwork, Mr. Partin approached A.L., ordered her to leave with him, grabbed her by the wrist, and pulled her down the stairs. A.L. left with Mr. Partin, got in a van that her mother was driving, and subsequently switched into a second van. Mr. Partin told A.L. that he and A.L.'s mother had stolen the second van from an auto dealership. They retrieved A.L.'s siblings and began driving

5

towards Mexico to avoid the Amber Alert that they believed would go out when it was discovered A.L. was gone. On the drive to Mexico, Mr. Partin and A.L. had sexual intercourse several times, and she performed oral sex on Mr. Partin.

Eventually, Mr. Partin and A.L.'s mother decided not to continue on to Mexico, and instead drove to Ohio. While in Ohio, Mr. Partin had sexual intercourse and oral sex with A.L. before the FBI eventually found them and arrested Mr. Partin.

**B**

Prior to trial, Mr. Partin filed a motion to suppress the statements he made to the park rangers before he was read his *Miranda* rights. The magistrate judge recommended denying the motion to suppress and concluded that Mr. Partin was not the subject of a *Terry* stop, but rather a consensual police-citizen encounter. The magistrate judge alternatively found that even if Mr. Partin were deemed to be the subject of a *Terry* stop, the officers had "a particularized and objective basis for suspecting criminal activity, both at the time the rangers initially approached the vehicle and afterward." D.E. 146 at 10.

The magistrate judge also concluded that Mr. Partin was not effectively in custody during the encounter with the officers. As a result, the officers were not required to give him *Miranda* warnings.

6

First, the magistrate judge found that there was no restraint to the degree associated with formal arrest because there was no evidence that the officers blocked the campsite to prevent Mr. Partin from leaving, that they threatened or touched him, or indicated that he was forced to comply.  The magistrate judge found that the tone of the encounter was generally calm and cooperative and that Mr. Partin freely consented to searches and willingly answered questions.  In the magistrate judge's view, this was not the highly intrusive coercive atmosphere that would require *Miranda* warnings.

Second, the scope of the investigatory stop was not exceeded, and thus, did not mature into an arrest requiring probable cause as well as *Miranda* warnings prior to questioning.  In applying a four-factor test, the magistrate judge concluded that (1) that the officers' investigative techniques were quick, with minimum interference; (2) nothing in the record indicated that the officers were less than prompt in carrying out their investigation; (3) an officer's instruction to Mr. Partin that he remain by his car was not overly intrusive, but rather was reasonable in light of the circumstances; and (4) although two hours is longer than the average *Terry* stop, in this scenerio the officers were diligent and the total amount was reasonable in relation to the purpose of the stop and the necessary scope of the investigation.

The district court adopted the magistrate judge's report and denied Mr. Partin's motion to suppress.

## C

Before trial, the government filed a motion in limine stating that it would seek to introduce evidence of Mr. Partin's motive and intent, including testimony of analysts who would testify as to two matters: the results of the DNA analysis performed on A.L.'s underwear found at the campsite (which contained Mr. Partin's semen); and the analysis performed regarding the paternity of A.L.'s baby (which showed that Mr. Partin was the father). Mr. Partin argued that the government should be prohibited from introducing any evidence concerning his sexual relationship with A.L. before the events alleged in the indictment, as well as any evidence concerning the paternity of A.L.'s baby. Mr. Partin argued that the evidence was inadmissible under Federal Rule of Evidence 403 and 404. Mr. Partin further argued that it was not until the paternity test results were revealed, which was after the indictment was issued, that he learned he was likely the father of the child. He alleged that he believed a person named "Eric" was the father of the child. Therefore, he continued, at the time of the trip to Tennessee and the subsequent trip to Ohio, the paternity test results were irrelevant because the elements of the charge were his intent and motive at the time of the trip.

8

The district court ruled that evidence as to prior sexual encounters between A.L. and Mr. Partin was admissible, but reserved ruling on the admissibility of the paternity test results until after A.L. testified. The district court instructed the government to not go into the DNA evidence during opening statements or during direct examination.

At trial, after the government had presented A.L.'s testimony on direct examination—during which A.L. testified that she and Mr. Partin had sex in Tennessee and Ohio—Mr. Partin claimed that the government "ha[d] opened the door" on the matter of A.L's past sexual partners and the possible paternity of her child. Accordingly, Mr. Partin argued that cross-examination in this area was appropriate. The district court warned Mr. Partin that if his intention was to show that there existed a person named "Eric" that could have been the father of the child, then "the DNA probably definitely comes in to show that Eric is not the father of this child." D.E. 297 at 54. During cross-examination, Mr. Partin questioned A.L. about Eric. Subsequently, the district court ruled that the DNA paternity evidence was admissible: "[T]he probative value is pretty overwhelming for two reasons. Number one is it refutes your implied contention that she's lying. Secondly, the DNA test shows that in fact he was the father, so there's no prejudice at all." *Id.* at 69.

9

At the close of the government's case and at the conclusion of trial, Mr. Partin moved for judgment of acquittal, arguing that the government failed to prove beyond a reasonable doubt all of the elements of counts two and three. Mr. Partin conceded that A.L. was transported in interstate commerce and that she was a minor, but he denied that he transported her across state lines with the intent to engage in unlawful sexual activity. The district court denied each of the motions. The jury found Mr. Partin guilty of all three charges in the indictment.

At sentencing, Mr. Partin objected to the PSI, which recommended a two-level enhancement for obstruction of justice. The district court overruled the objection, finding that Mr. Partin obstructed justice by lying on two occasions during his testimony at trial. The district court stated:

> First of all, when he denied taking A.L. out of Alabama to have sex. It's clear that his intent was to have sex with A.L. in Tennessee as well as in Ohio, and, in fact, he did [and] . . . independently and separately . . . [Mr. Partin] clearly perjured himself and obstructed justice when he claimed that he had sex with A.L., his step-daughter, because she sneaked into his bed and he mistook her for an older woman.

D.E. 329 at 10 (alterations added).

Mr. Partin raises four issues on appeal. First, he argues that the district court erred by denying his motion to suppress his pre-*Miranda* statements to officers because the officers lacked reasonable suspicion to stop him, and even if they had reasonable suspicion, the stop matured into a custodial detention before he was

given his *Miranda* warnings.  Second, Mr. Partin contends that the district court abused its discretion by admitting DNA evidence demonstrating that he was the father of A.L.'s child because the evidence was not relevant and because its prejudicial effect outweighed its probative value.  Third, Mr. Partin asserts that the district court erred in denying his motion for judgment of acquittal because the government did not prove beyond a reasonable doubt that he transported A.L. out of state with the intent to engage in unlawful activity with her.  Finally, Mr. Partin claims that the district court erred in applying a sentencing enhancement for obstruction of justice.

## II

In reviewing the denial of a motion to suppress, legal rulings are subject to *de novo* review and factual findings are reviewable for clear error.  *See United States v. Watkins*, 760 F.3d 1271, 1279 (11th Cir. 2014).  We consider the evidence in the light most favorable to the government, which prevailed below.  *See id.*  We are not restricted to the evidence presented at the suppression hearing, and may consider the record as a whole.  *See United States v. Jordan*, 635 F.3d 1181, 1185 (11th Cir. 2011).  Additionally, we afford substantial deference to the district court's credibility determinations, both explicit and implicit.  *See United States v. Lewis*, 674 F.3d 1298, 1303 (11th Cir. 2012).

11

The Fourth Amendment protects an individual's right to be secure against unreasonable searches and seizures. U.S. CONST. Amend. IV. Not all interactions between law enforcement and citizens, however, implicate the Fourth Amendment. *See Jordan*, 635 F.3d at 1185. Only when an officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen, may a court conclude that a seizure has occurred. *See id.*

There are three broad categories of police-citizen encounters for purposes of our Fourth Amendment analysis: (1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests. *See United States v. Perez*, 443 F.3d 772, 777 (11th Cir. 2006). With regard to the second category of police-citizen encounters, the Fourth Amendment does not prohibit a police officer in appropriate circumstances and in an appropriate manner from approaching a person for purposes of investigating possible criminal behavior, even though there is no probable cause to make an arrest. *See Jordan*, 635 F.3d at 1186.

Pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), law enforcement officers may seize a suspect for a brief, investigatory stop. Such a stop, known generally as a *Terry* stop, and can be conducted where the officer has reasonable suspicion that the subject was involved in, or is about to be involved in, criminal activity, and the

stop "was reasonably related in scope to the circumstances which justified the interference in the first place." *Jordan*, 635 F.3d at 1186.

Reasonable suspicion requires more than just a hunch; it demands that the totality of the circumstances create, at least, some minimal level of objective justification for the belief that the person was or is engaged in unlawful activity. *See United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995). The Supreme Court has firmly rejected the argument that a reasonable cause for an investigative stop can only be based on the officer's personal observation, rather than on information supplied by another person. *See Navarette v. California*, 134 S. Ct. 1683, 1688 (2014). In fact, where the information received can be corroborated by officers, it is sufficiently reliable to create reasonable suspicion of criminal activity. *See id.* Additionally, police may also draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them. *See United States v. Lindsay*, 482 F.3d 1285, 1290–91 (11th Cir. 2007). Whether reasonable suspicion exists is determined by considering the totality of the circumstances. *See Jordan*, 635 F.3d at 1186.

We agree with the district court's alternative finding that Mr. Partin was the subject of a *Terry* stop and there was reasonable suspicion for the officers to stop him. The officers had reasonable suspicion to conduct the stop based on the report they had received from a park employee regarding possible criminal activity and

13

their own initial observations at the scene.    We disagree with Mr. Partin's argument that the stop matured into a custodial detention for which *Miranda* warnings were required.    The stop did not exceed its scope, and Mr. Partin was not subjected to the same type of inherently coercive environment as a stationhouse interrogation.

*Miranda* warnings are required only when a defendant is "in custody," meaning that there has been either a formal arrest or a restraint on the defendant's freedom of movement that is of the degree associated with a formal arrest.  *See United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006).  Whether a person is in custody "depends on whether under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave."  *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (citation omitted).  Relevant factors include the location and duration of the questioning, the statements made during the interview, whether the defendant was physically restrained, and whether the defendant was released after questioning.  *See Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012).

Not all restraints on a person's freedom of movement constitute custody for purposes of *Miranda*.  Courts must determine "whether the relevant environment present[ed] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."  *Id.* at 1190.  In making that determination, we

14

have considered whether the circumstances were such that a reasonable person would have "believe[d] that he was utterly at the mercy of the police, away from the protection of any public scrutiny, and had better confess or else." *United States v. Acosta*, 363 F.3d 1141, 1150 (11th Cir. 2004). . Because the custody standard is objective, the subjective beliefs of the defendant and the officer as to whether the defendant was free to leave are irrelevant. *See Brown*, 441 F.3d at 1347.

In distinguishing between a *Terry* stop and an arrest, we consider four nonexclusive factors: "(1) the law enforcement purpose served by the detention; (2) the diligence with which the officers pursued the investigation; (3) the scope and intrusiveness of the investigation; and (4) the duration of the detention." *Street*, 472 F.3d at 1306. In balancing these factors, we focus on "whether the police diligently pursued a means of investigation likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id.* (quotation and citation omitted).

First, in analyzing the law enforcement purposes served by the detention, the most important consideration is whether the police quickly and with minimum interference pursued a method of investigation that was likely to confirm or dispel their suspicions. *See Acosta*, 363 F.3d at 1146. Here, Officer Morrison approached the vehicle and asked for identification to confirm the ages of the passengers. Given that the park employee's report was that the female passenger

15

was young and possibly a minor, asking for identification to determine age was the quickest method to confirm or dispel the suspicion that A.L. might be a minor.

Second, "we ask whether the police were diligent in pursuing their investigation, that is, whether the methods the police used were carried out without unnecessary delay." *Id.* The record indicates that the officers were diligent and that the methods they used did not create unnecessary delay. Although separating A.L. and Mr. Partin created some delay because Officer Morrison had to walk up and down the hill to communicate with each of them, this was necessary under the circumstances. Separation, and any extra time spent corroborating their stories, was reasonable to get the truth from A.L. about her identity and age without any pressure from Mr. Partin for her to lie.

Third, "we ask whether the scope and intrusiveness of the detention exceeded the amount reasonably needed by police to ensure their personal safety." *Id.* "While restriction on freedom of movement is a factor to be taken into account in determining whether a person is under arrest, it alone is not sufficient to transform a *Terry* stop into a *de facto* arrest." *Id.* at 1147 (citation omitted). Until Mr. Partin was handcuffed, his freedom of movement was only restricted with regards to going up the hill to speak with A.L. Other than that, he was free to walk around within the vicinity of his vehicle and smoke. Restricting Mr. Partin from A.L. was necessary to ensure that officers could determine her age without Mr.

16

Partin's insistence that she was 18. Additionally, Mr. Partin was in possession of his car keys and his cellphone the entire time. The only brief exception was when Officer Morrison used the phone to write down the contact information of the person who could be reached to find A.L.'s legal guardian.

The "final factor is whether the duration of the detention was reasonable." *Id.* From our discussion of the third factor, it is clear that the amount of time was reasonable under the circumstances of this case. Although two hours may be longer than a typical *Terry* stop, it was reasonably necessary in this case.

In summary, the stop did not evolve into a custodial detention for which *Miranda* warnings were required because it did not exceed its scope. The district court did not err in denying Mr. Partin's motion to suppress his pre-*Miranda* statements.

### III

Next we turn to Mr. Partin's challenge to the admission of the DNA paternity evidence. We review a district court's evidentiary rulings for an abuse of discretion. *See United States v. Augustin*, 661 F.3d 1105, 1123 (11th Cir. 2011). Even if the district court's ruling constitutes abuse of discretion, however, we will reverse only if the error was not harmless. *See id.* An evidentiary error is harmless unless, in light of the record as a whole, there is a reasonable likelihood that the error had a substantial influence on the outcome of the proceeding. *See id.*

17

Federal Rule of Evidence 404(b) provides that although "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," such "evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Evidence is admissible under Rule 404(b) if (1) the evidence is relevant to an issue other than the defendant's character; (2) there is sufficient proof to enable a jury to find by a preponderance of the evidence that the defendant committed the act(s) in question; and (3) the probative value of the evidence cannot be substantially outweighed by undue prejudice, and the evidence must satisfy Federal Rule of Evidence 403. *See United States v. Ford*, 784 F.3d 1386, 1393 (11th Cir. 2015).

Such evidence may be independently admissible if it arose out of the same transaction or series of transactions as the charged offense, is necessary to complete the story of the crime, or is inextricably intertwined with the evidence regarding the charged offense. *See id.* Whether offered under Rule 404(b) or as intrinsic evidence, the district court must find that the probative value of the proffered evidence is not substantially outweighed by unfair prejudice and that it meets the other requirements of Rule 403. *See id.* In reviewing a district court's decision not to exclude evidence under Rule 403, we "view the evidence in the

18

light most favorable to admission, maximizing its probative value and minimizing its undue prejudicial impact." *United States v. Bradberry*, 466 F.3d 1249, 1253 (11th Cir. 2006).

The district court did not err in admitting the DNA evidence establishing Mr. Partin as the father of A.L.'s child because it was relevant for a number of reasons. First, it was relevant to Mr. Partin's motive and intent for taking A.L. to Tennessee. It also provided context as to why Mr. Partin took A.L. from her medical appointment while she was in the custody of the DHR, and why he attempted to flee to Mexico. Further, as the district court noted, the evidence was relevant to refute Mr. Partin's implied contention that A.L. was lying about her relationship with him and the implication that Eric was the father of her child.

Finally, the probative value of the paternity test was not substantially outweighed by any risk of unfair prejudice because there was other evidence in the record, to which Mr. Partin did not object, from which the jury could have found that Mr. Partin had a sexual relationship with his stepdaughter and inferred that he was the father of her child. Even assuming the district court had erred in admitting the paternity evidence, Mr. Partin has not demonstrated that the evidence had a substantial prejudicial impact on the outcome of the trial.

**IV**

19

We review *de novo* the denial of a motion for judgment of acquittal on sufficiency of the evidence grounds. *See United States v. Friske*, 640 F.3d 1288, 1290 (11th Cir. 2011). In reviewing the sufficiency of the evidence, we review the evidence in the light most favorable to the government and draw all reasonable inferences and credibility choices in the government's favor. *See id.* at 1290–91. The evidence is sufficient if a reasonable trier of fact could find that it established the defendant's guilt beyond a reasonable doubt. *See United States v. Beckles*, 565 F.3d 832, 840 (11th Cir. 2009).

Federal law prohibits the knowing transportation, in interstate commerce, of an individual under the age of 18 with the intent to engage in criminal sexual activity. *See* 18 U.S.C. § 2423(a). To prove that Mr. Partin violated § 2423(a), the government had to prove that he (1) knowingly transported A.L. in interstate commerce; (2) A.L. was under the age of 18; and (3) Mr. Partin intended to engage in criminal sexual activity with A.L. *See id.*

As to the element of intent, we have often noted the difficulty in establishing a defendant's state of mind. *See United States v. Jernigan*, 341 F.3d 1273, 1279 (11th Cir. 2003). Given this difficulty, intent most often is inferred from circumstantial evidence. *See United States v. Manoocher Nosrati-Shamloo*, 255 F.3d 1290, 1292 (11th Cir. 2001). Thus, where there is some corroborative evidence of the defendant's guilt and the defendant testifies in his own defense, his

testimony may by itself establish elements of the charged offense. *See United States v. Ellisor*, 522 F.3d 1255, 1272 (11th Cir. 2008). This is especially true of subjective elements such as the defendant's intent. *See id.* We have also noted that the jury is allowed to disbelieve the defendant and to infer that the opposite of his testimony is true. *See United States v. Pendergraft*, 297 F.3d 1198, 1211 (11th Cir. 2002).

Here, the government presented evidence that Mr. Partin took A.L. across state lines, had intercourse with her, and had her perform oral sex on him. Mr. Partin claimed in his trial testimony that the intention of his traveling from Alabama to Tennessee was for the purpose of starting a new life with his family and that the trip to Ohio was to allow A.L. to live with the family again and not with child services. But the jury was free to reject his testimony and conclude that it was not true. Sufficient evidence supports the jury's finding that Mr. Partin acted with the requisite intent for violating § 2423(a), and the district court did not err in denying his motion for judgment of acquittal.

V

Mr. Partin's last argument concerns the district court's sentencing enhancement for obstruction. The government bears the burden of establishing the facts necessary to support a sentencing enhancement by a preponderance of the evidence. *See United States v. Perez-Oliveros*, 479 F.3d 779, 783 (11th Cir. 2007).

21

We review a district court's interpretation and application of the advisory sentencing guidelines to the facts *de novo*, and review its findings of fact for clear error. *See United States v. Barrington*, 648 F.3d 1178, 1194–95 (11th Cir. 2011). A factual finding is clearly erroneous when, upon review of the evidence, we are left with a definite and firm conviction that a mistake has been made. *See id.* at 1195. Additionally, we give substantial deference to the district court's implicit and explicit credibility determinations concerning witness testimony. *See Lewis*, 674 F.3d at 1303.

The Sentencing Guidelines provide for a two-level enhancement if the defendant willfully obstructs or attempts to obstruct the administration of justice with regard to the prosecution of his offense of conviction. *See* U.S.S.G. § 3C1.1. Obstruction of justice includes perjury. *See id.*, comment. (n.4(B)). In the context of § 3C1.1, we have defined perjury as "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." *United States v. Moran*, 778 F.3d 942, 981 (11th Cir. 2015). *See also* U.S.S.G. § 3C1.1, comment. (n.2).

Mr. Partin argues that the application of § 3C1.1 constituted error. We disagree.

In finding that the obstruction of justice enhancement applies, a district court should clearly and separately address each element of its perjury finding. *See*

22

*United States v. Equanazi*, 752 F.3d 912, 938 (11th Cir. 2014). We may, however, "affirm a district court's enhancement even absent particularized findings regarding the defendant's perjury so long as the district court found in general that the defendant's testimony was perjurious as to material matters and the record supports that finding." *United States v. Hatney*, 80 F.3d 458, 463 (11th Cir. 1996) (citing *United States v. Dobbs*, 11 F.3d 152, 155 (11th Cir. 1994)).

The district court did not err in finding that Mr. Partin perjured himself on material matters when he denied taking A.L. out of Alabama with the intent to engage in criminal sexual activity. We give substantial deference to the district court's decision to credit A.L.'s testimony over Mr. Partin's regarding the sexual activity that occurred on the two trips, and other evidence presented at trial supports the district court's finding. As such, the district court did not err in applying the obstruction of justice enhancement.

## VI

For the reasons stated above, we affirm Mr. Partin's convictions and sentence.

**AFFIRMED.**