PROCTOR, District Judge:
This appeal involves an infrequently charged crime: misprision of a felony in violation of 18 U.S.C. § 4. Courtnee Nicole Brantley was convicted of misprision as a result of her actions during and following a traffic stop on June 29, 2010. Brantley raises several challenges to her conviction. She argues that she was the subject of selective prosecution, the prosecution violated her Fifth Amendment privilege against self-incrimination, and there was insufficient evidence to support the verdict against her. After careful review and with the benefit of oral argument, we disagree. For the reasons stated below, we affirm Brantley’s conviction.
I. BACKGROUND
The misprision charge brought against Brantley stems from tragic events that occurred on June 29, 2010. Brantley was pulled over in a routine traffic stop. Brantley’s boyfriend, convicted felon Don-tae Morris, was a passenger in her car. Upon questioning by the police, he emerged from the car and shot and killed two officers. He then fled on foot as Brantley sped away. Within minutes, Brantley spoke with Morris on a cell phone, and thereafter hid the car and exchanged texts with Morris. The traffic *1269 stop itself — including the shootings — was recorded by the dashboard video camera in a police car. The video was played for the jury.
At trial, the jury ultimately found that Brantley knew about a federal felony (her convicted-felon boyfriend’s possession of the firearm which he used to shoot the officers), did not report that crime to the authorities, and, in the aftermath of the murders, took affirmative steps to conceal Morris’s felony from the authorities.
II. SUMMARY OF RELEVANT FACTS
At about 2:13 a.m. on June 29, 2010, Tampa Police Officer David Curtis pulled over Brantley’s car because it did not have a license tag. Brantley provided her driver’s license and vehicle documentation, and Officer Curtis discussed the tag violation with her. Officer Curtis also questioned Morris, who gave Curtis his name and birthdate. Officer Curtis entered Morris’s information into his patrol car’s computer. An outstanding warrant came up, along with a warning that Morris had previously resisted arrest.
A backup officer, Jeffrey Kocab, arrived on the scene, and both officers approached the passenger side of Brantley’s car. Officer Curtis told Morris to step out of the car. As he exited the car, Morris pulled a gun and shot Officers Curtis and Kocab in the head. Both officers died from their wounds. Morris ran in one direction, and Brantley drove off in another. The entire traffic stop — including the shootings — was captured by the dashboard video camera in Officer Curtis’s vehicle.
Within a minute of the shootings, Brant-ley called Morris. Two more phone calls between them soon followed. Brantley drove to an apartment complex located about three miles from the murder scene. Therefore, the calls between Brantley and Morris necessarily occurred prior to the time Brantley parked the car.[1] Brantley parked the car a distance from the apartment in which she hid. When Brantley parked, she backed the car into a space (and up against some bushes) in order to conceal the missing license tag.
Following their phone conversations, and within minutes after the shootings, Brantley and Morris had the following exchange of text messages:
Morris: “Your ride dont need 2 be park by the spot neither.”
Brantley: “No. Still n here, bt way round corner. I nd to move it sum-where else tho.”
Morris: “Just lean bak til 2morrow. you phone in your name.”
Brantley: “No.”
Morris: “Bet im bout 2 turn my shiit off til 2morrow i love you.”
Brantley: “I love u with my last breath.”
Morris: “Yea just lean bak stay loyal.”
Brantley: “Of course ... Til death do us part.”
Brantley’s texts all included the tagline: “ON MY OWN LEVEL.”
A few minutes later, Brantley sent text messages to several other people: “U ha-vent seen me.U dont know where im at.Please dont tell anyone anything. Erase these messages!” When one of those people questioned her, Brantley explained, “Just make like I never exisisted!”
The police eventually located Brantley in an apartment some 500 yards and across a lake from where she had parked her car. During questioning, Brantley admitted that she had been pulled over, someone had been injured', and she had fled the scene. She further admitted that she had *1270 a passenger in the car, but refused to disclose Morris’s last name.
Morris was arrested after three days, and was prosecuted by the State of Florida for the two murders. Brantley went to trial on the misprision of a felony charge.[2] After- the Government put on its case, Brantley rested without presenting any evidence. The case then went to the jury.
The jury was instructed that, in order for Brantley to be found guilty of misprision, it must find “that a federal felony as charged in Count I of the Indictment was committed[,] that the defendant had actual knowledge of the commission of the felony[,] that the defendant did not as soon as possible make known the felony to some judge or other person in civil or military authority[, and] that the defendant did an affirmative act to conceal the crime.” The court further instructed that, in the event the jury found Brantley guilty, it should disclose the acts of concealment that it found she had committed, (“there’s blanks for you to write in whatever act or acts you find”). Consistent with the trial court’s instruction, the verdict form directed the jury (in the event it found Brantley guilty) to “describe the act or acts you find, Brantley committed to conceal the crime of felon in possession of [a] firearm and ammunition.”
The jury returned a verdict of guilty against Brantley on the misprision charge. In response to the special jury interrogatory, the jury explained that it found evidence of the following acts: “The defendant knowingly and willfully concealed her knowledge of the possession of a firearm and ammunition by a convicted felon from the authorities by coordinating via phone calls and text messages with Dantae [sic] Morris.” After return of the verdict, the district court gave the jury the opportunity to be more specific as to the “acts of concealment” it found. The jury declined to supplement or alter its verdict.
III. STANDARD OF REVIEW
“[I]n reviewing the denial of a motion to dismiss for selective prosecution, we review the district court’s factual findings for clear error and its legal conclusions de novo.” United States v. Jordan, 635 F.3d 1181, 1185 (11th Cir.2011) (citing United States v. Smith, 231 F.3d 800, 806 (11th Cir.2000)).
We also review the district court’s application of the Fifth Amendment privilege de novo. United States v. Hernandez, 141 F.3d 1042, 1049 (11th Cir.1998).
We review de novo a verdict challenged for sufficiency of the evidence, “resolving all reasonable inferences in favor of the verdict.” United States v. Farley, 607 F.3d 1294, 1333 (11th Cir.2010). If there is a reasonable basis in the record for the verdict, we must sustain it. Id.
IV. DISCUSSION
Brantley presents the following arguments on appeal: (1) the district court should have dismissed the charge against her because she was selectively prosecuted; (2) the prosecution violated her Fifth Amendment privilege against self-inerimi-nation; and (3) the district court should have ordered a judgment of acquittal or a new trial because there was insufficient evidence to support the jury’s verdict. We address each of these arguments below, but find they lack merit.
*1271 A. Brantley Did Not Establish that Her Prosecution was Improperly Selective
It is axiomatic that with limited law enforcement resources, the Government is unable to prosecute every crime that is committed. Decisions regarding which crimes will be prosecuted are entrusted by the United States Constitution to the Executive Branch, which is charged with seeing that our nation’s laws are enforced. See U.S. Const., Art. II, § 3 (“he shall take Care that the Laws be faithfully executed”). “The judiciary cannot interfere with a prosecutor’s exercise of charging discretion, except in narrow circumstances where it is necessary to do so in order to discharge the judicial function of interpreting and applying the Constitution.” Smith, 231 F.3d at 807. “[UJnder the Due Process Clause of the Fifth Amendment, ‘the decision whether to prosecute may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification.’ ” Jordan, 635 F.3d at 1188 (quoting Smith, 231 F.3d at 807). However, a presumption exists that a prosecutor has not violated equal protection principles, and a defendant challenging her conviction on this ground must satisfy a “demanding” burden to establish that she is being selectively prosecuted. Id.; Smith, 231 F.3d at 807. In order to overcome that presumption, a defendant must present clear evidence of a selective prosecution. Smith, 231 F.3d at 807.
A defendant asserting that she was selectively prosecuted must show “that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose.” Jordan, 635 F.3d at 1188 (quoting Smith, 231 F.3d at 808). In other words, a criminal defendant who claims she was subjected to selective prosecution must establish two elements: (1) the discriminatory effect prong of this test requires a showing that “similarly situated individuals were not prosecuted” (id. (quoting Smith, 231 F.3d at 809)), and (2) “[t]he discriminatory purpose prong requires that the decisionmaker selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group” (id. (quoting Wayte v. United States, 470 U.S. 598, 610, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) (internal quotation marks omitted))). “Further, in order to obtain an evidentiary hearing on a selective prosecution claim, ‘the defendant, must present facts sufficient to create a reasonable doubt about the constitutionality of a prosecution.’ ” Id. (quoting United States v. Silien, 825 F.2d 320, 322 (11th Cir.1987)).
Here, the District Court concluded that it was “unnecessary to discuss whether [Brantley] ... met the first prong since she has clearly failed to meet the second.” We agree that Brantley failed to establish the second element but we also conclude, based upon the record evidence before us, that she did not satisfy the first element either.
1. Brantley Has Not Shown That She is Similarly Situated to Her Purported Comparator.
Based upon our rule pronounced in Jordan, it was incumbent upon Brantley to show by clear evidence that a similarly situated individual was not prosecuted for misprision. As we have explained, “a ‘similarly situated’ person for selective prosecution purposes [is] one who engaged in the same type of conduct, which means that the comparator committed the samé basic crime in substantially the same manner as the defendant — so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government’s enforcement priorities and *1272 enforcement plan — and against whom the evidence was as strong or stronger than that against the defendant.” Smith, 231 F.3d at 810. In a different context — when a Title VII plaintiff complains she was treated differently than a similarly situated co-worker — we have required the plaintiff and the employee she identifies as a comparator to be similarly situated “in all relevant respects.” Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir.2004) (citing Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir.1997)). As we have explained, the comparator must be nearly identical to the plaintiff to[1] prevent courts from second-guessing a reasonable decision by the employer. Wilson, 376 F.3d at 1091; see Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1259 (11th Cir.2001). The same considerations apply in a challenge based upon selective prosecution because, in all but an exceedingly narrow number of cases, a court is not free to second-guess the prosecutor’s exercise of charging discretion. Thus, applying the Smith rationale to the record evidence, we conclude Brantley’s contention that she is similarly situated to McMillan is off the mark.
In pressing her selective prosecution claim, Brantley has identified a single comparator — Quinisha McMillan. Brant-ley alleged the following facts related to McMillan: (1) McMillan never properly reported to law enforcement information about the murder of a civilian;[3] (2) the same homicide detective who interviewed Brantley in relation to Morris’s shooting of Officers Curtis and Kocab also spoke (some two weeks later) with McMillan about Morris allegedly murdering a civilian; (3) McMillan acknowledged hosting Morris in her home after the civilian was shot; (4) McMillan saw Morris in possession of a firearm; and (5) Morris and others indicated to McMillan that it was Morris who killed the civilian.
But there were also significant differences between Brantley and McMillan in relation to their knowledge of the two cases and their respective silence about Morris’s conduct. Indeed, three examples of these differences are readily apparent in the record before us. First, McMillan was not actually present at the time that Morris used the firearm he unlawfully possessed to commit a second felony — namely, murder; conversely, Brantley was at the scene with Morris when he murdered the two officers. Second, McMillan was warned by Morris about the consequences of snitching and that warning was punctuated by threats and a physical beating (at the hands of Morris and two of his acquaintances); however, Brantley, without threat or intimidation, pledged to stay loyal to Morris “[t]il death do us part.” Finally, Morris’s possession of a firearm in McMillan’s presence, which McMillan failed to report, occurred at a time which was separate from and clearly after Morris allegedly used that firearm to commit the second. crime of murder; on the other hand, Brantley was aware, but failed to report, that Morris was in possession of a firearm at the very time that he shot and killed two police officers. These important differences between Brantley and McMillan provide sufficient reason, in and of themselves, for us to determine that the two are not truly comparators and the prosecution had legitimate reasons for viewing them differently. But, here, there is even more.
*1273 As the jury determined beyond a reasonable doubt, Brantley not only failed to disclose Morris’s crime, but also took affirmative steps to conceal it. In fact, the jury found that Brantley knowingly and willfully concealed her knowledge of Morris’s crime “by coordinating via phone calls and text message with [him].” The evidence adduced at trial amply supports the jury’s finding. On the other hand, and as the district court found, Brantley has not alleged that McMillan committed any act of concealment. We also note that Morris’s possession of a firearm in this case led to the killing of two police officers.[4]
Of course, all murders are tragic and senseless. But the government’s choice to prosecute crimes associated with the killing of police officers differently than those associated with the killing of civilians is a permissible exercise of prosecutorial discretion. As we explain below, that decision is not based on any protected classification. Moreover, prosecution of crimes against police officers serves unique deterrent interests.
Here, there is a substantial question whether McMillan violated the misprision statute. But even if she did, Brantley has failed to establish that she and McMillan are similarly situated. She is simply not properly viewed as Brantley’s comparator.
2. Brantley Has Not Shown That the Decision to Prosecute Her Was Based Upon Any Constitutionally Impermissible Standard.
Apart from failing to show that she was similarly situated to McMillan, Brantley’s selective prosecution claim fails for another reason. She has failed to establish that the decision to prosecute her, but not McMillan, was based on “an unjustifiable standard such as race, religion, or other arbitrary classification.” United States v. Armstrong, 517 U.S. 456, 464, 116 S.Ct. 1480, 1486, 134 L.Ed.2d 687 (1996).
Brantley asserts that the impermissible “arbitrary classification” was her exercise of her Fifth Amendment right against self-incrimination. But that assertion cuts no ice at all. Brantley admitted to the police that she had been pulled over, that someone had been injured, and that she had fled the scene by herself. Thus, Brantley, on her own, volunteered information which was sufficient to self-incriminate for the crime of leaving the scene of a lawful traffic stop. It follows that her refusal to identify Morris was, at that point, irrelevant to any Fifth Amendment privilege she asserted after the fact.
Nor is there any merit to Brant-ley’s argument that she was unconstitutionally prosecuted because the victims of the crime Morris committed ■ (while with her) were law enforcement. As we have already observed, the murders Brantley and McMillan had knowledge of involve different deterrence interests. It does not offend the Constitution when a prosecutor considers the potential deterrent effect of a case’s prosecution. See Armstrong, 517 U.S. at 465, 116 S.Ct. at 1486 (“Such factors as the strength of the case, the prosecution’s general deterrence value, the Government’s enforcement priorities, and the case’s relationship to the Government’s overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.”); see *1274 also United States v. Rice, 659 F.2d 524, 527 (5th Cir. Unit A 1981) (concluding, in a criminal tax case, that “selection for prosecution based in part upon the potential deterrent effect on others serves a legitimate interest in promoting more general compliance with the tax laws. Since the government lacks the means to investigate every suspected violation of the tax laws, it makes good sense to prosecute those who will receive, or are likely to receive, the attention of the media.”) (quoting United States v. Catlett, 584 F.2d 864, 868 (8th Cir.1978)). And there is nothing in our Constitution that prohibits a prosecutor from taking into account the circumstances of a crime in making a charging decision. In particular, to the extent Brantley was prosecuted because the United States aimed to deter witnesses to police shootings from concealing those crimes, that decision was neither arbitrary nor unconstitutional. The executive branch enjoys the discretion to treat violence against a law enforcement official (when committed while the officer is in the line of duty) differently than violence against civilians. And, in fact, the respective executive branches of our federal and state governments have elected to do just that. See, e.g., Fla. Stat. § 921.141(5)0’) (listing, among the aggravating factors for death-penalty consideration, “The victim of the capital felony was a law enforcement officer engaged in the performance of his or her official duties.”); see also Collier v. Turpin, 177 F.3d 1184, 1203 (11th Cir.1999) (recognizing, as an aggravating circumstance of murder conviction, the fact that murder victim was police officer); cf. USSG § 3A1.2(e)(1) (six-level enhancement if defendant assaulted law enforcement officer).
Brantley’s prosecution publicized the fact that those who conceal evidence about the capital murder of a police officer will be prosecuted and that fact, without question, could have a deterrent effect on others. The district court did not commit error when it denied Brantley’s motion to dismiss based on her claim of selective prosecution.[5]
B. Brantley’s Prosecution Did Not Violate Her Fifth Amendment Privilege Against Self-Incrimination
The Fifth Amendment provides that “[n]o person ... shall be compelled in any criminal case to be a witness against himself.” U.S. Const., Amend. V. However, a suspect is on different footing once she knowingly and voluntarily waives her right to remain silent by answering some of law enforcement’s questions. If she thereafter wishes to invoke her right to remain silent, she “must articulate [her] desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent.” Coleman v. Singletary, 30 F.3d 1420, 1424 (11th Cir.1994), cert. denied, 514 U.S. 1086, 115 S.Ct. 1801, 131 L.Ed.2d 727 (1995).
Brantley argues that, because reporting Morris’s crime (of possessing a firearm used to murder two police officers) would have revealed a crime she had committed (leaving the scene of a traffic stop), her prosecution for misprision violates her Fifth Amendment rights. We disagree.
Brantley’s argument is fatally flawed in at least this respect: in the district court, she was not prosecuted for her silence. Rather, she was prosecuted *1275 because she knowingly participated in affirmative acts of concealment of Morris’s crime — i.e., (1) hiding herself and the car and (2) calling and texting Morris in an effort to conceal his crime. Given the facts of this case, we need not decide whether the Fifth Amendment would protect Brantley from prosecution if all she did was remain silent. Here, Brantley did not merely remain silent. As the jury determined, she also concealed evidence. And the Fifth Amendment does not shield a defendant from prosecution for her affirmative acts of concealment. See Brogan v. United States, 522 U.S. 398, 404, 118 S.Ct. 805, 139 L.Ed.2d 830 (1998) (“Proper invocation of the Fifth Amendment privilege against compulsory self-incrimination allows a witness to remain silent, but not to swear falsely.”). Just as an individual cannot use the Fifth Amendment to shield a false statement to a law enforcement officer (and thus, in that context, defend herself from prosecution for misprision of a felony), neither may Brantley use the Fifth Amendment to shield her affirmative acts of concealing evidence of Morris’s crime.
Finally, it is important to note that Brantley freely admitted to the police that she had been pulled over, someone had been “injured,” and that she had fled the scene by herself. She further admitted that she had a passenger in the car, but refused to disclose Morris’s last name. Thus, Brantley herself freely admitted a violation of Florida law by stating that she had fled the scene of a traffic stop. She did not invoke her right to remain silent before providing the police with any of these details. Thus, her subsequent prosecution for misprision, which required the government to show affirmative acts of concealment (not merely her silence) did not violate her Fifth Amendment right to remain silent. This is not a close question. The district court did not err in failing to sua sponte grant Brantley a judgment of acquittal on the basis of her right against self-incrimination.
C. There Was Sufficient Evidence to Support the Jury’s Verdict
Brantley next argues that the evidence was insufficient to convict her of misprision. We reject her contention. The misprision statute provides that “[wjhoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States,” is guilty of misprision. 18 U.S.C. § 4. The statute, though, has been construed to require also “some affirmative act of concealment or participation.” Itani v. Ashcroft, 298 F.3d 1213, 1216 (11th Cir.2002).
At Brantley’s trial, the district court correctly explained that the crime of misprision is comprised of four elements.[6] *1276 The district court’s instruction regarding the elements of the crime of misprision is consistent with the definition articulated by the Third Circuit. See Baer v. United States, 722 F.3d 168, 176 (3rd Cir.2013). We hereby adopt the Third Circuit’s definition and conclude that the elements of the crime of misprision are: “(1) the principal committed and completed the felony alleged; (2) the defendant had full knowledge of that fact; (3) the defendant failed to notify authorities; and (4) the defendant took steps to conceal the crime.” Id. (quoting United States v. Gebbie, 294 F.3d 540, 544 (3d Cir.2002) (internal quotations omitted)). We also conclude that the district court properly instructed the jury that, in order to find Brantley guilty of the crime of misprision, the Government was required to prove each of those four elements beyond a reasonable doubt.
The next question is whether there was sufficient evidence adduced at trial to support the jury’s verdict. We will uphold a conviction as supported by sufficient evidence “if a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt.” United States v. Jiminez, 564 F.3d 1280, 1284-85 (11th Cir.2009) (internal quotation marks omitted). We resolve “all reasonable inferences and credibility evaluations in favor of the jury’s verdict” and leave a defendant’s convictions undisturbed “ ‘unless no trier of fact could have found guilt beyond a reasonable doubt.’ ” United States v. Tinoco, 304 F.3d 1088, 1122 (11th Cir.2002) (quoting United States v. Calderon, 127 F.3d 1314, 1324 (11th Cir.1997)).
The only element of the crime that Brantley has challenged on sufficiency grounds is the fourth one, requiring an affirmative act of ’concealment. At trial, the jury heard evidence that Brantley fled the scene after Morris shot and killed the police officers. The jurors also heard evidence indicating that in the minutes following the murder of the officers, Brantley and Morris spoke during three phone calls. The jury further heard evidence that, at around the same time, Brantley and Morris exchanged text messages about concealing the car and staying loyal. After her conversations with Morris, Brantley actually concealed the car and hid herself in a distant apartment away from the vehicle. A reasonable jury could conclude that the subject of the telephone calls was similar to the subject of the text messages— i.e., they involved discussions about how and where to hide evidence (the car). The car linked Brantley to Morris and also linked Morris to the possession of the weapon involved in the murder of the two police officers, which was committed in Brantley’s presence. And, Morris, who Brantley knew to be a felon, committed the murders while being in possession of a firearm.
In response to a question on the verdict form asking it to identify Brantley’s affirmative act or acts of concealment, the jury stated that “[t]he defendant knowingly and willfully concealed her knowledge of the possession of a firearm and ammunition by a convicted felon from the authorities by coordinating via phone calls and text messages with Dantae [sic] Morris.” (Emphasis added). A reasonable jury could conclude based upon the evidence presented at trial that the coordination between Brantley and Morris, both phone calls and text messages, was hiding the car.
Nor is it significant that the jury declined the district court’s request to further explain its answer to the special interrogatory. In United States v. Bran, 776 F.3d 276 (4th Cir.2015), Bran argued that the district court erred in denying his motion for judgment of acquittal. At trial, the district court -instructed the jury to return a general verdict on a felon in possession count and, if the jury deter *1277 mined Bran was guilty, to then answer a three-part special interrogatory. Bran, 776 F.3d at 278-79. Somewhat similar to what occurred below, the jury in Bran returned a general verdict of guilty, but failed to answer one of the three parts of a special interrogatory. Id. Bran moved for a judgment of acquittal based on the jury’s failure to answer the one part of the special interrogatory. Id. at 279. The Fourth Circuit held that Bran’s focus on the jury’s failure to answer part of the special interrogatory ignored the jury’s general verdict. Id. at 280. As the Bran court noted, “the jury’s general guilty verdict alone is sufficient to uphold [his] conviction.” Id. Here, as in Bran, the jury’s general guilty verdict necessarily includes a finding that Brantley engaged in an affirmative act (or acts) of concealment. There is more than sufficient evidence in the record to support that verdict.
Finally, there was sufficient evidence of affirmative acts of concealment to support the jury’s guilty verdict. “[R]eeeipt or possession of evidence has regularly been considered a sufficient affirmative act to support conviction under the misprision statute.” United States v. Davila, 698 F.2d 715, 718 (5th Cir.1983); see also United States v. King, 402 F.2d 694 (9th Cir.1968). So has the removal of evidence. United States v. Stuard, 566 F.2d 1 (6th Cir.1977). Again, this case does not involve a mere failure to report a crime. Rather, there is sufficient evidence of affirmative concealment of evidence — i.e., the removal and hiding of evidence related to a crime (the car) — to support the jury’s finding of an affirmative act of concealment. After review of this record, we cannot say that no trier of fact could have found Brantley guilty beyond a reasonable doubt. Therefore, the district court did not err in denying her a judgment of acquittal and declining to order a new trial. See Tinoco, 304 F.3d at 1122; Calderon, 127 F.3d at 1324.
Y. CONCLUSION
For the foregoing reasons, Brantley’s misprision conviction is
AFFIRMED.

. Driving at 60 miles per hour, one would drive one mile every minute.

. This was Brantley's second trial. In the first trial, the jury was unable to reach a unanimous verdict.

. McMillan did not report Morris's possession of a firearm (and purported involvement in the murder of a civilian) until long after the crime occurred. It was not until substantially later that McMillan gave sworn testimony to that effect in a separate case in which Morris was prosecuted for murder of a civilian.

. In the district court, Brantley complained that McMillan was not prosecuted for misprision because the civilian who Morris allegedly murdered “was not a police officer, and the [civilian’s] tragic death did not rise to the level of public outrage and associated pressures surrounding the deaths of two police officers....” Similarly, Brantley contended that McMillan was not prosecuted because Morris’s purported murder of the civilian did not “reach beyond ordinary citizens and into the ranks of law enforcement.”

. We also conclude that, because Brantley did not present a colorable claim of selective prosecution, the district court did not abuse its discretion in refusing to hold an evidentia-ry hearing on that issue.

. In our earlier decision, which reversed the district court’s earlier dismissal of the charge against Brantley, we referenced the essential elements of misprision as follows: "knowledge of a crime and some affirmative act of concealment or participation.” United States v. Brantley, 461 Fed.Appx. 849, 851 (11th Cir.2012). But, at that time, we were simply reviewing the district court's finding that dismissal of the indictment was warranted because there was no evidence of an affirmative act of concealment by Brantley. Therefore, only the affirmative act of concealment element of the crime was at issue before the Court at that time. Jd. at 851-52.
We cited Itani in discussing the element of the crime requiring an affirmative act of concealment. However, the question before us in Itani was not the proper delineation of the elements of misprision of a felony, but rather whether misprision constitutes a crime of moral turpitude. 298 F.3d at 1216. In Itani, we were not called upon to address what elements must be established to prove the crime of misprision.

. Only Fifth Circuit decisions issued before October 1, 1981, are binding on this Court. Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).