[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-16982
_____

D.C. Docket No. 5:15-cr-00018-MTT-CHW-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CHAVEZ ANTWON HUNTER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

(January 9, 2020)

Before JORDAN, GRANT, and SILER,∗ Circuit Judges.

PER CURIAM:

_____

∗Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting
by designation.

Chavez Hunter pleaded guilty to illegal receipt of a firearm by a person under indictment in violation of 18 U.S.C. § 922(n) and § 924(a)(1)(D).  Prior to entering his plea, Hunter moved for an evidentiary hearing to suppress evidence recovered after he was stopped and detained by Deputy Matthew Cota.  Following a hearing, the district court denied Hunter's motion.  Now, Hunter appeals his conviction and sentence, arguing that the district court erred in denying his motion to suppress.

We affirm.

## I.    BACKGROUND

In the early morning of September 15, 2014, Bibb County Sheriff's Deputy Cota was on patrol in Georgia in his marked police vehicle.  Shortly after 2 a.m., he received a call about suspicious activity in the nearby area.  A homeowner reported that lawn equipment had been removed from his garage and placed beside the road. The caller stated that several neighbors had expressed similar complaints, and that it was believed that after placing the equipment by the road, someone would load it into a vehicle and drive away.

Cota patrolled the area looking for anyone who might have been involved. Shortly before 3 a.m., Cota encountered Hunter walking alongside Forsyth Road, a two-lane road with no sidewalk, surrounded by woods on both sides.  Hunter caught Cota's attention because of the prior report of suspicious activity, the late hour, and the rarity of pedestrian traffic on that particular road.  Cota drove to the opposite side

2

of the road from Hunter, rolled down his window, and asked Hunter what he was doing. Hunter said he was walking to his girlfriend's house in Unionville, which Cota knew to be over five miles away. Cota then rolled up his window and began to drive away.

After driving a short distance, a gut feeling prompted Cota to quickly turn around. He drove back to where he had encountered Hunter and stopped his vehicle in the road. Although Hunter was walking directly toward Cota's front bumper, the cruiser was not blocking Hunter's path, because he was walking alongside the road, not in it. Cota then got out of his vehicle and began speaking with Hunter. He again asked Hunter where he was going, and informed Hunter that he was investigating a burglary report. After talking to Hunter for a few minutes and expressing concern for his safety, Cota offered him a ride, which was a routine practice in this type of situation. However, Hunter argues that Cota's offer was actually a request or command, and that he was not free to decline the ride.

Hunter hesitated for a moment before saying "sure." Before letting him in the police cruiser, protocol required Cota to pat down Hunter's outer clothing. When Cota told Hunter of this policy, Hunter's demeanor suddenly changed and his body language became tense. Cota, standing about five feet from Hunter at this point, moved in closer and asked Hunter whether he was carrying any weapons. Hunter put his hands up and replied that he had one tucked "in his belt loop in front." After

3

telling Hunter, "Don't go for it. I'm going to remove it," Cota pulled up Hunter's shirt, saw a revolver, and pulled it out.

Cota did not handcuff Hunter; instead, he put him in the back of his patrol vehicle with either the door or window cracked, and placed the revolver in the front seat. Cota suspected that Hunter might not have had a license to carry a concealed firearm, and that it might have been stolen. It was standard procedure for an officer who comes in contact with a weapon to contact dispatch and run a check to see if the firearm had been used in a crime or was stolen.

Cota radioed dispatch concerning Hunter's information and to check the revolver's serial number. Hunter then informed Cota that he was carrying the gun for his safety and that it belonged to his cousin. Cota immediately called Hunter's cousin, who denied owning the firearm. About nine to fifteen minutes after contacting dispatch, Cota was informed that Hunter had an active arrest warrant for a violation of probation for burglary, a felony. About five or six minutes later, dispatch informed Cota that the firearm was not stolen. Upon learning of the outstanding warrant, Cota had Hunter step out of the vehicle to handcuff him, placed him back in the vehicle, and transported him to the law enforcement center.

Following this incident, Cota wrote two separate reports. The first was written the morning of the incident, and the second was written about a week later. Cota testified that the first report was not as detailed as it should have been, so he was

4

asked to write a second one.  In his first report, he wrote that he had "stated" to Hunter that he would give him a ride, but in the second report Cota replaced "stated" with "advised."  He later testified that he typically uses such words when preparing his reports, and that he had asked Hunter whether he wanted a ride rather than commanding him to get into the cruiser.

Hunter was subsequently charged in a one-count indictment with illegal receipt of a firearm by a person under indictment, in violation of 18 U.S.C. § 922(n) and § 924(a)(1)(D).  Hunter filed a motion to suppress, arguing that he was unjustifiably seized by Cota, and therefore any evidence obtained from the events that followed were fruits of the poisonous tree.  He claimed that Cota did not satisfy the two-part requirement for a valid *Terry* stop, as Cota lacked reasonable suspicion that Hunter had any involvement in criminal activity — he was not acting suspiciously, and provided adequate explanations to Cota's questions.  Hunter also argued that Cota exceeded the scope of any permissible investigatory detention by requiring him to accept a ride in the police car.

Following an evidentiary hearing, the district court denied Hunter's motion to suppress.  The court determined that Hunter and Cota were engaged in a consensual encounter until, at the earliest, when Hunter reacted to Cota's statement about the frisk, and that reasonable suspicion supported the seizure.  Hunter then entered a conditional guilty plea, reserving the right to appeal the district court's order.

## II.    STANDARD OF REVIEW

The denial of a motion to suppress presents a mixed question of law and fact. We review the district court's findings of fact for clear error and the application of law to those facts *de novo*.  *United States v. Dixon*, 901 F.3d 1322, 1338 (11th Cir. 2018).   In addition, we construe all facts in the light most favorable to the prevailing party below.  *Id.*

## III.    DISCUSSION

Hunter offers two grounds for suppression.  First, he argues that he was unlawfully seized at the outset of his second encounter with Cota.  Second, he argues that even if he was not seized until his nervous reaction to the prospect of being frisked, this seizure was not supported by reasonable suspicion.  Therefore, Hunter claims, any evidence obtained from the events that followed should be suppressed as fruits of the poisonous tree.  We address each argument in turn.

### A. Hunter was not seized until he informed Cota that he was carrying a firearm.

The Fourth Amendment prohibits unreasonable searches and seizures.  U.S. Const. amend. IV.  We have identified "three broad categories of police-citizen encounters for purposes of our Fourth Amendment analysis: (1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests." *United States v. Perez*, 443 F.3d 772, 777 (11th Cir. 2006).  Under the first category, officers may approach individuals on the

6

street or other public places, ask questions if they are willing, ask for identification, and request consent to search, "provided they do not induce cooperation by coercive means." *United States v. Drayton*, 536 U.S. 194, 200–01, 122 S.Ct. 2105, 2110 (2002). "There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets." *United States v. Franklin*, 323 F.3d 1298, 1301 (11th Cir. 2003) (quoting *Terry v. Ohio*, 392 U.S. 1, 34, 88 S.Ct. 1868, 1886 (1968) (White, J., concurring)). These "consensual" encounters do not trigger Fourth Amendment scrutiny. *United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011).

"A seizure under the Fourth Amendment happens when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Franklin*, 323 F.3d at 1301. A seizure triggers constitutional scrutiny, and thus must be justified by either reasonable suspicion or probable cause, depending on the severity of the intrusion. *Jordan*, 635 F.3d at 1185. In determining the point at which a consensual encounter becomes a seizure, we consider whether "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Drayton*, 536 U.S. at 202, 122 S.Ct. at 2111 (internal quotation marks omitted). This test is "objective and *presupposes* an innocent person." *Id.* (internal quotation marks omitted) (emphasis in original). If a reasonable person would not feel free to terminate the encounter, or if the citizen's

cooperation is induced by "coercive means" such as physical force or a show of authority, a seizure has occurred and the citizen's Fourth Amendment rights are implicated. *Jordan*, 635 F.3d at 1186 (citation omitted). In applying this test, we consider the "totality of the circumstances." *Id.* Relevant factors in this analysis include: (1) whether the individual's path is blocked or impeded; (2) whether identification is retained; (3) the individual's age, education and intelligence; (4) the length of the individual's detention and questioning; (5) the number of police officers present; (6) the display of weapons; (7) any physical touching of the suspect; and (8) the language and tone of voice of the police. *Id.* We are mindful that these factors are not all-encompassing and should not be applied rigidly. *Id.*

The district court found that the seizure occurred when Hunter exhibited nervous behavior upon learning that he would need to be frisked. Hunter argues that the seizure occurred far earlier, because a reasonable person would not have felt at liberty to leave from the moment Cota first returned. He directs us to the following pertinent facts: Cota (1) stopped his police cruiser directly in Hunter's path; (2) activated the cruiser's rear blue lights; (3) exited the vehicle; (4) told Hunter that he was investigating a burglary report; (4) questioned Hunter's presence in the area; and (5) offered Hunter a ride in the police cruiser. The government counters that Cota did not display a show of force or coerce Hunter into continuing the conversation, and thus the encounter remained consensual until Hunter's nervous

8

reaction.

First, Hunter argues that Cota blocked his path by stopping his cruiser directly in front of him, such that Hunter was walking toward Cota's front bumper. Our holding in *Jordan* is instructive on this point — the defendant was walking down the middle of the street, when an officer slowed down and pulled over his vehicle to engage him "in a way that did not block [his] path." 635 F.3d at 1187. Here, Hunter was walking alongside a two-lane road with no sidewalk, thus giving Cota little recourse but to simply come to a stop in the road — he did not maneuver the vehicle in a way that clearly obstructed Hunter's walking path. Moreover, Hunter concedes that he could have simply walked around Cota's car.

Next, Hunter directs us to Cota's activation of the rear blue lights on the police cruiser as indicative of a seizure. The government argues that this was merely a safety precaution taken by Cota to alert oncoming traffic that he was stopped in the middle of the road, as it was night and Forsyth Road did not have streetlights. We have yet to address how blue light activation factors into a determination of whether a person has been seized. The Seventh Circuit is the only federal circuit court to specifically address whether an individual is seized at the moment a police officer activates emergency lights; however, the defendant in that case was in a car, not on foot. *United States v. Clements*, 522 F.3d 790, 792 (7th Cir. 2008). The *Clements* court noted that although the flashing lights may have contributed to the defendant's

9

feeling restrained, this did not constitute a seizure; ultimately, the court did not decide the issue because the defendant had waived it. *Id.* at 794-95. In our view, the mere act of turning on rear blue lights does not automatically signal that a person has been seized.

Next, Hunter claims that Cota demonstrated a "show of authority" when he exited the vehicle, approached Hunter, and began asking questions. But the Supreme Court has repeatedly held that such actions do not necessarily constitute a seizure. *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 2386 (1991) ("[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions."). "Law enforcement officers do not violate the Fourth Amendment . . . merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *Drayton*, 536 U.S. at 200, 122 S.Ct. at 2110. Moreover, "[e]ven when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search . . . provided they do not induce cooperation by coercive means." *Id.* at 201, 122 S.Ct. at 2110. Like the officers in *Jordan*, Cota did not brandish his weapon, block or impede Hunter's path, ask Hunter for identification, or touch him. *Jordan*, 635 F.3d at 1187. Cota remained calm throughout the encounter, never threatening Hunter or raising his tone of voice, and asked reasonable questions regarding Hunter's presence in the area and his

10

destination.   Hunter answered Cota's questions, and Cota did not "by means of physical force or show of authority" restrain Hunter's liberty.  *Bostick*, 501 U.S. at 434, 111 S.Ct. at 2386 (quoting *Terry*, 392 U.S. at 19 n.16, 88 S.Ct. at 1879 n.16).

Finally, Hunter argues that even if the encounter remained consensual, it was transformed into a seizure when Cota offered him a ride. As a threshold matter, we agree with the district court's finding that Cota's statement is better construed as an offer than a specific directive for Hunter to follow.  Cota testified that he used the term "advised" in virtually all of his reports, and that it is not materially different from his use of the term "stated" in his first report of this incident.  Further, he testified that he had asked Hunter whether he wanted a ride, that Hunter was free to decline this request, and that his offer was accompanied with an expression of concern for Hunter's safety.  Hunter argues that a reasonable person in his position — a felon on probation, unlawfully carrying a concealed firearm — would not have felt free to accept a ride, exposing himself to possible arrest.  But the "reasonable person" test is an objective standard, one that "calls for consistent application from one police encounter to the next, regardless of the particular individual's response to the actions of the police."  *Michigan v. Chesternut*, 486 U.S. 567, 574, 108 S. Ct. 1975, 1980 (1988).  An objective reasonable person standard "ensures that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being approached."  *Id.*  Accordingly, in determining whether

11

Hunter was seized, we decline to substitute Hunter's specific viewpoint for that of a reasonable person. As to the offer itself, in a recent case with very similar facts, our sister circuit held that an officer "[o]ffering [the defendants] a ride did not turn what was a consensual encounter into a seizure or otherwise implicate the Fourth Amendment." *United States v. Lozano*, 916 F.3d 726, 730 (8th Cir. 2019). Likewise, Cota's offer of a ride was the result of a consensual conversation regarding Hunter's destination. Given that Hunter was walking to a destination over five miles away, an offer of a ride was a natural question to ask, not a coercive tactic.

The seizure began only when Hunter informed Cota that he was armed, when Cota closed the gap between him and Hunter, made physical contact by frisking Hunter, and seized the firearm. At this point, a reasonable person would not have felt free to decline Cota's request, or terminate the encounter. *See Jordan*, 635 F.3d at 1186 (explaining that "[t]he ultimate inquiry [about whether an encounter was consensual] remains whether a person's freedom of movement was restrained by physical force or by submission to a show of authority."). Therefore, the firearm was discovered pursuant to Cota's investigatory stop.

## B. The seizure was supported by reasonable suspicion.

A seizure must be supported by an objective, particularized basis. As relevant to the instant case, an officer may conduct a brief, warrantless, investigatory stop if he can show "a reasonable, articulable suspicion that criminal activity is afoot."

*Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 675 (2000). Such investigatory stops, commonly known as *Terry* stops, must be justified from the outset, and be reasonably related in scope to the circumstances that justified the stop. *United States v. Griffin*, 696 F.3d 1354, 1358 (11th Cir. 2012). Reasonable suspicion is a less demanding standard than probable cause, and requires only a "minimal level of objective justification" that is "considerably less than" the preponderance of the evidence. *United States v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004). Although important facts may lend themselves to an innocent interpretation when considered individually, they may collectively support an officer's reasonable suspicion. *United States v. Arvizu*, 534 U.S. 266, 274–75, 122 S.Ct. 744, 751 (2002). Officers may rely on inferences and deductions "that might well elude an untrained person." *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695 (1981). As such, "behavior, seemingly innocuous to the ordinary citizen, may 'appear suspect to one familiar with [criminal] practices.'" *United States v. Smith*, 201 F.3d 1317, 1323 (11th Cir. 2000) (quoting *United States v. Glover,* 957 F.2d 1004, 1010 (2d Cir. 1992)). We therefore afford great deference to the judgment of trained law enforcement officers on the scene. *See United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003), citing *Saucier v. Katz*, 533 U.S. 194, 205-06, 121 S.Ct. 2151, 2158 (2001).

Additionally, once an officer has legitimately stopped an individual, the

13

officer can perform a frisk so long as "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883. "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, the officer may conduct a patdown search to determine whether the person is in fact carrying a weapon." *Minnesota v. Dickerson*, 508 U.S. 366, 373, 113 S.Ct. 2130, 2136 (1993) (internal quotation marks omitted). Furthermore, "although an individual may ultimately be engaged in conduct that is perfectly lawful … officers may detain the individual to resolve the ambiguity." *Lewis* 674 F.3d at 1304 (internal quotation marks omitted).

Cota's testimony reveals that he relied on multiple articulable facts in determining that reasonable suspicion existed to justify a brief investigatory detention of Hunter. Specifically, the government notes that: (1) Hunter was walking alone at nearly 3 a.m., on a two-lane road with no sidewalks that was hardly ever used by pedestrians; (2) Cota encountered Hunter in an area relatively close to where he had received the report of a burglary; (3) when Cota indicated that he would need to frisk Hunter before transporting him to his destination, Hunter became noticeably tense; and (4) Hunter informed Cota that he was armed.

We agree with the government that each of these factors may be considered in determining whether the totality of the circumstances supports a reasonable suspicion that criminal activity was afoot. As to Hunter's reaction to the patdown, nervous or evasive behavior is a relevant factor in determining whether reasonable suspicion existed. *United States v. Gordon*, 231 F.3d 750, 756 (11th Cir. 2000). However, nervous behavior alone cannot support a finding of reasonable suspicion. *Brent v. Ashley*, 247 F.3d 1294, 1304 (11th Cir. 2001). Here, Hunter's nervous reaction was one among several articulable factors that informed Cota's reasonable suspicion.

Finally, when Hunter admitted to carrying a firearm, Cota made a split-second decision to detain him and seize the weapon. The government argues that this action is consistent with *Terry*, which emphasizes officer safety as an important policy interest for courts to recognize in determining reasonable suspicion. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883. When an officer has stopped someone, "he may conduct a pat-down or frisk for weapons if he reasonably believes that his safety, or the safety of others, is threatened." *Griffin*, 696 F.3d at 1359. "Firearms are dangerous, and extraordinary dangers sometimes justify unusual precautions." *Florida v. J.L.*, 529 U.S. 266, 272,

120 S.Ct. 1375, 1379 (2000).   Protective searches during seizures address this concern.  *Id.*  We conclude that Cota's seizure of Hunter at this point was objectively reasonable, given the dangers inherent in concealed firearms.

Lastly, Hunter argues that a 2014 Georgia statute prohibited Cota from seizing him.  He directs us to Georgia's "Guns Everywhere Law," which provides: "[a] person carrying a weapon shall not be subject to detention for the sole purpose of investigating whether such person has a weapons carry license." O.C.G.A. § 16-11-137(b).  But the statute plainly invalidates only one particular action: detaining an individual for the *sole purpose* of determining whether he had a weapons carry permit.  Here, the district court found that Cota had reasonable suspicion to detain Hunter based on the totality of the circumstances.  Therefore, the district court correctly concluded that O.C.G.A. 16-11-137(b) did not preclude Cota from detaining Hunter to continue his investigation.  Hunter's position fails to recognize that "[t]he presumptive lawfulness of an individual's gun possession in a particular State does next to nothing to negate the reasonable concern an officer has for his own safety when forcing an encounter with an individual who is armed with a gun and whose propensities are unknown." *United States v. Robinson*, 846 F.3d 694, 701 (4th Cir. 2017).

## IV.    CONCLUSION

Hunter himself acknowledges that the "totality of the circumstances can sometimes justify a reasonable suspicion, when the individual circumstances would not." We agree. Cota had reasonable suspicion to detain Hunter. The district court correctly denied Hunter's motion to suppress.

**AFFIRMED.**